IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TIPPMANN CONSTRUCTION, INC., | § | |
| by and through its assignee and subrogee | § | |
| SELECTIVE INSURANCE COMPANY | § | |
| OF SOUTH CAROLINA | § | |
| | § | |
| V. | § | ACTION NO. 4:11-CV-591-Y |
| | § | |
| PROFESSIONAL SERVICE | § | |
| INDUSTRIES, INC. | § | |

AMENDED ORDER GRANTING MOTION FOR
PARTIAL SUMMARY JUDGMENT AND OVERRULING OBJECTIONS

Pending before the Court is Defendant's Second Amended Motion for Partial Summary Judgment (doc. 79), filed July 10, 2012.  The Court GRANTS the motion.

I.  BACKGROUND

Plaintiff Tippmann Construction, Inc. ("Tippmann"), is a construction company specializing in the design and construction of refrigerated warehouses.  Kroger engaged Tippmann to design and build a cold-storage center ("the project").  The project had two phases: renovation of an existing cold-storage structure and new construction to expand Kroger's cold-storage facilities.  (Pl. App. 48.)  Tippmann contracted with defendant Professional Service Industries, Inc. ("PSI"), to perform various engineering tests on the project.  (Pl. App. 78.)

A.  The First Proposal and Contract

On January 23, 2008, PSI submitted a proposal ("the first proposal") for construction-materials testing and inspection services for the project, which stated that "All work will be performed in accordance with the General Conditions attached herein and considered a part of this proposal."  (Def. App. 6; Pl. App. 2.)  The general conditions included a section entitled

"**WARRANTY**,"[1] which contained a limitation of liability:

> SHOULD PSI OR ANY OF ITS PROFESSIONAL EMPLOYEES BE FOUND TO HAVE BEEN NEGLIGENT IN THE PERFORMANCE OF ITS WORK, OR TO HAVE MADE AND BREACHED ANY EXPRESS OR IMPLIED WARRANTY, REPRESENTATION, OR CONTRACT, CLIENT, ALL PARTIES CLAIMING THROUGH CLIENT AND ALL PARTIES CLAIMING TO HAVE IN ANY WAY RELIED UPON PSI'S WORK AGREE THAT THE MAXIMUM AGGREGATE AMOUNT OF THE LIABILITY OF PSI, ITS OFFICERS, EMPLOYEES AND AGENTS SHALL BE LIMITED TO $25,000.00 OR THE TOTAL AMOUNT OF THE FEE PAID TO PSI FOR ITS WORK PERFORMED WITH RESPECT TO THE PROJECT, WHICHEVER AMOUNT IS GREATER.

(Def. App. 11.)  Although the warranty section included other provisions, which were also in all capital letters, the warranty section was the only section in the general conditions that was so capitalized.  The language of the other general-condition sections were in regular type.  (Pl. Resp. 14.)  The general conditions also included an indemnity clause, which provided that PSI would hold Tippmann harmless from "any and all claims . . . arising out of PSI's negligence."  (Def. App. 11, 25.)  But the indemnity clause stated it was "[s]ubject to the foregoing limitations," which the parties do not dispute included the limitation-of-liability clause.  (Def. App. 11, 25.)  The general conditions also contained a merger provision entitled "**ENTIRE AGREEMENT**":  "This agreement constitutes the entire understanding of the parties, and there are no representations, warranties or undertakings made other than as set forth herein.  This agreement may be amended, modified or terminated only in writing, signed by each of the parties hereto."  (Def. App. 11, 25.)

Tippmann signed and returned the first proposal along with the general conditions to PSI on March 26 ("the first contract").  (Def. App. 7, 11; Pl. App. 3, 78.)  The next day, Tippmann sent a

---

[1]Although one copy of the general conditions provided by Tippmann in its appendix does not have the capitalized headings underlined, the parties seem to agree that they were, in fact, underlined. (Resp. 14; Mot. Br. 4; Pl. App. 89.)

purchase order to PSI.  (Def. App. 5; Pl. App. 78.)  The purchase order stated that Tippmann's "subcontract agreement . . . [is] hereto made part of this contract."  (Pl. App. 45.)  Tippmann's customary "corporate policy" is to "issue a Subcontract Agreement to each subcontractor or supplier that will be performing work on a construction Project," which would then "govern the parties' relationship." (Pl. App. 3.) Tippmann's subcontract agreement contained an indemnification clause[2] that required any subcontractor, such as PSI, to indemnify, defend, and hold Tippmann harmless "against any and all losses, claims, demands and damages of whatever nature and kind arising out of, or resulting from, the performance" of the subcontract.  (Pl. App. 29.)  As was its custom, Tippmann sent PSI a subcontract agreement with the purchase order.  (Pl. App. 78.)  There is no summary-judgment evidence showing that the subcontract regarding the first contract was signed by PSI.

## B. The Second Proposal and Contract

Tippmann then asked PSI to conduct soil boring for the expansion portion of the project. (Pl. App. 46, 78; Def. App. 14.)  On March 28, PSI submitted a proposal for the soil boring ("the second proposal").  (Def. App. 14-16; Pl. App. 3, 78.)  The second proposal stated that "[i]t is also proposed that the work be performed pursuant to the PSI General Conditions," which were attached to the second proposal ("the second contract").[3]  (Def. App. 15-16.)  On April 2, Tippmann sent a purchase order for the second contract, which again referenced Tippmann's subcontract agreement. (Def. App. 13.)  PSI signed and returned Tippmann's subcontract agreement in connection with the

_____

[2]An indemnification clause is "a promise to safeguard or hold the indemnitees harmless against either existing and/or future loss liability."  *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993).

[3]Although PSI requested that Tippmann sign and return a copy of the second proposal to authorize PSI's work, there is no summary-judgment evidence that Tippmann did so other than the fact that Tippmann later issued a purchase order.  (Def. App. 16.)  Tippmann does not argue that it did not agree to PSI's second proposal.  (Pl. App. 2-3, 78.)

second contract, amending the indemnification clause to state the indemnification would be "[t]o the extent of subcontractor's negligence" instead of "[t]o the fullest extent permitted by law." (Def. App. 3, 42, 51, 53.)

## C.  THE THIRD PROPOSAL AND CONTRACT

In December, Tippmann requested that PSI perform geotechnical-engineering services on the renovation portion of the project. (Pl. App. 78; Def. App. 18.) Specifically, Tippmann asked PSI to "perform some additional testing services related to the frozen soil encountered on the renovation portion of the Project." (Pl. App. 78.) On December 23, PSI submitted a proposal for the additional work ("the third proposal") and again stated "[t]he work will be performed pursuant to the PSI General Conditions." (Def. App. 22.) That same day, Tippmann signed and accepted the third proposal ("the third contract"). (Def. App. 24.) Tippmann asserts that it received only the acceptance page of the third proposal from PSI, which it signed and returned to PSI to accept the December 23 proposal.[4] (Pl. App. 65.) Neither Tippmann nor PSI have produced a purchase order regarding the third contract.

## D.  THE INSTANT LITIGATION

After the project was completed, Kroger reported cracks and differential movement on the floor of the renovation project. (2nd Am. Compl. 4.) Tippmann repaired the floor, but PSI would not reimburse Tippmann for the repair costs. Tippmann filed a complaint against PSI for breach of contract, indemnity, and negligence. Tippmann alleged that the floor movement was caused by PSI's "failure to consider or address ice-rich soil samples taken at a depth of 13 feet (meaning that

---

[4]Although Tippmann argues that it never received PSI's general conditions in connection with any of PSI's proposals, PSI's summary-judgment evidence shows that Tippmann faxed the general conditions back to PSI when it accepted the first proposal on March 26. (Def. App. 6-11.)

ice-rich conditions may have existed to a depth of 17 feet), and that PSI's recommendations of 6ft of select fill were inadequate to compensate for the remaining 11 feet of frozen soil." (2nd Am. Compl. 4, 5.) Tippmann assigned its claims, rights, and causes of action in this case to its insurer, Selective Insurance Company of South Carolina. PSI now seeks partial summary judgment on the ground that Tippmann agreed in the general conditions to limit any damages incurred as a result of PSI's work to $25,000. Tippmann contends that its subcontract agreement containing no limitation of liability, rather than PSI's general conditions, governed the parties' relationship.

## II.  SUMMARY-JUDGMENT STANDARD OF REVIEW

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions, etc.), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. *See* Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See id.* 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the

record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5ᵗʰ Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5ᵗʰ Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5ᵗʰ Cir. 2010) (citation and internal quotation marks omitted). "[I]f no reasonable juror could find for the non-movant," summary judgment should be granted. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5ᵗʰ Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The interpretation of an unambiguous contract is a legal issue that may be decided on summary judgment. *See Boudreaux v. Unionmutual Stock Life Ins. Co. of Am.*, 835 F.2d 121, 123 (5ᵗʰ Cir. 1988). The plain meaning of contractual language controls unless there is more than one reasonable interpretation of the disputed language. *See Int'l Turbine Servs., Inc. v. BASP Brazilian Airlines*, 278 F.3d 494, 497 (5ᵗʰ Cir. 2002); *cf. Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co.*, 112 F.3d 184, 186 (5ᵗʰ Cir. 1997) (applying same principles to interpretation of insurance contract). And if the contractual provisions are unambiguous and the determination of coverage does not depend on the resolution of disputed facts, summary disposition is particularly appropriate. *See Gonzalez v. Denning*, 394 F.3d 388, 395 (5ᵗʰ Cir. 2004).

## III. DISCUSSION

### A. CONTRACT-INTERPRETATION PRINCIPLES AND APPLICATION

6

In interpreting a contract, the Court's primary concern is to determine the true intent of the parties as reflected in the contract itself. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 831 (Tex. 2009); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). If a contract as written can be given a definite or certain meaning, it is not ambiguous; however, if the language of a contract is subject to two or more reasonable interpretations, it is ambiguous. *See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). "[A] contract is not ambiguous merely because the parties to an agreement proffer conflicting interpretations of a term." *Gonzalez*, 394 F.3d at 392; *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006). Extrinsic evidence is not admissible to contradict or vary the meaning of unambiguous language in a written contract and may not be used to create an ambiguity. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996).

The parol-evidence rule provides that the terms of a written contract cannot be contradicted by evidence of an earlier, inconsistent agreement. *See Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Under the rule, if the parties have integrated their agreement into a single written memorial, all prior negotiations and agreements with regard to the same subject matter are excluded from consideration. *See id.* Further, a written instrument presumes that all prior agreements have been merged into it and cannot be added to, varied, or contradicted by parol evidence. *See id.* This merger doctrine is particularly applicable when the written contract contains a recital that it constitutes the entire agreement between the parties. *See id.*

More interpretation issues arise in cases where the contract could be comprised of more than one document. If the documents are "executed at the same time, with the same purpose, and in the

course of the same transaction," the documents are construed together. *Calpetco 1981 v. Marshall Exp., Inc.*, 989 F.2d 1408, 1412 (5th Cir. 1993). Even if the separate instruments are executed at different times, they may be construed as part of a single, unified instrument if they pertain to the same transaction. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). Specifically, if a contract consists of two parts—a general contract followed by later work orders—the actual contract between the parties will consist of the blanket contract as modified by the later work orders. *See Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 315 (5th Cir. 1990). But multiple documents cannot be considered together unless they refer to each other or refer to the same subject matter. *See Woodhaven Homes, Inc. v. Alford*, 143 S.W.3d 202, 205 (Tex. App.—Dallas 2004, no pet.).

Here, the parties entered into a contract for PSI to conduct subcontract work for Tippmann on the project. PSI issued a separate proposal for each portion of the work Tippmann asked PSI to perform. (Mot. 2.) Each proposal was the precursor to a separate contract because each (1) was entered into at different times, (2) was for different services to be performed by PSI on different phases of the project, (3) was for a different sum, (4) did not refer to the other proposals, and (5) contained a merger clause. (Def. App. 2-3.) *See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216 (5th Cir. 2009). Tippmann does not dispute that it signed each proposal and, with the first two proposals, issued purchase orders.

Tippmann seems to argue that the three contracts should be construed together as one contract based on Tippmann's general intent: "If additional work is added to [a] subcontractor's work, a change order or a subsequent purchase order will be issued to the subcontractor for the extra work. It is Tippmann's intent that its subcontract agreement will govern all changes to a

subcontractor's scope of work regardless of whether the change is reflected in a change order or a purchase order[]." (Pl. App. 48.) However, applying the principles of contract interpretation to the four corners of the contracts shows that they should stand alone as three separate contracts and should not be considered one contract. *Cf. Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex. App.—Fort Worth 1991, writ denied) (holding single contract divisible where performance consists of several distinct and separate items and price paid by other party is apportioned to each item); *In re Ferguson*, 183 B.R. 122, 124-25 (Bankr. N.D. Tex. 1995) (same). This interpretation seems especially correct because each contract contained a merger clause, did not refer to the other contracts, and all three were for different sums. *See UNC Lear*, 581 F.3d at 216; *In re Ferguson*, 183 B.R. at 124-25.

## B. CONSPICUOUS

As a preliminary matter, Tippmann argues that PSI's limitation-of-liability clause is unenforceable as a matter of law because it is not conspicuous.[5] (Resp. 12-16.) A release clause surrenders legal rights or obligations between parties to an agreement and operates to eliminate a cause of action. *See Dresser Indus.*, 853 S.W.2d at 508. Indemnity clauses, which relieve a party of all liability in advance, and release clauses are subject to the fair-notice requirement of conspicuousness. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 387 (Tex. 1997); *Dresser Indus.*, 853 S.W.2d at 508 & n.1. *See generally* Tex. Bus. & Com. Code Ann. § 1.201(b)(10) (West 2009) (defining "conspicuous"); *Ling & Co. v. Dover Corp.*, 790 S.W.2d 559, 561 (Tex. 1972) (explaining that conspicuousness requirement mandates "that something must appear on the face of the

---

[5]Whether a contractual clause is conspicuous is a question of law for the Court. *See Dresser Indus.*, 853 S.W.2d at 510. Additionally, contracting parties can limit their liability in damages to a specified amount under Texas law. *See Global Octanes Tex., L.P. v. BP Exploration & Oil, Inc.*, 154 F.3d 518, 521 (5th Cir. 1998).

[contract] to attract the attention of a reasonable person when he looks at it."). The clause at issue here—PSI's limitation of liability included in its general conditions—does not relieve PSI of all liability. Thus, it is not a clause subject to the conspicuousness requirement. *See Bergholtz v. Sw. Bell Yellow Pages, Inc.*, 324 S.W.3d 195, 199 (Tex. App.—El Paso 2010, no pet.).

Even if PSI's limitation-of-liability clause were subject to the conspicuousness requirement, PSI's clause meets it. PSI placed the clause in all capital letters in the general conditions, which was the only section so capitalized. Only the "**WARRANTY**" section, including the limitation-of-liability clause, was capitalized. As such, it would draw Tippmann's attention and was sufficiently conspicuous because the language was "set off from surrounding text of the same size by symbols or other marks that call[ed] attention to the language." Tex. Bus. & Com. Code Ann. § 1.201(b)(10)(B); *Cronus Offshore, Inc. v. Kerr McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 856-57 (E.D. Tex. 2004), *aff'd*, 133 F. App'x 944 (5th Cir. 2005).

## C. THE FIRST CONTRACT

The summary-judgment evidence shows that Tippmann signed and returned PSI's first proposal and general conditions, which included PSI's limitation-of-liability clause. (Pl. App. 3.) Tippmann's purchase order referred to the subcontract agreement, which included an indemnification clause. Tippmann's policy was to issue a subcontract agreement to each subcontractor that would govern the parties relationship. (Pl. App. 3.) PSI does not deny that it received the subcontract agreement along with the purchase order, and Tippmann asserts that its general policy was to issue a subcontract agreement to every subcontractor. (Pl. App. 3, 48.) Thus, the first contract included PSI's limitation-of-liability clause, PSI's indemnification clause, and Tippmann's indemnification clause.

10

Texas law presumes that the parties to a contract intended every clause to have some effect. *Philadelphia Am. Life Ins. Co. v. Turner*, 131 S.W.3d 576, 590 (Tex. App.—Fort Worth 2004 no pet.). Thus, no single provision should be given controlling effect. *See SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). Here, the indemnity clauses (one contained in PSI's general conditions and one contained in Tippmann's subcontract agreement) provided that PSI would hold Tippmann harmless and indemnify Tippmann for claims[6] or damages arising out of PSI's performance of the subcontract. But the limitation-of-liability clause, which was also part of Tippmann and PSI's contract, limited such indemnification to $25,000. These two clauses may be read together to give effect to both: PSI was required to indemnify Tippmann for claims arising out of PSI's performance of the first contract, but only up to $25,000. Further, because the limitation-of-liability clause was included before Tippmann's indemnity clause and because there was no merger clause contained in Tippmann's subcontract agreement, the limitation-of-liability clause is favored. *See Lavaca Bay Autoworld, LLC v. Marshall Pontiac Buick Oldsmobile*, 103 S.W.3d 650, 659 (Tex. App.—Corpus Christi 2003), *appeal dismissed after settlement*, 2003 WL 21356104 (Tex. App.—Corpus Christi June 12, 2003, no pet.). Thus, Tippmann's claims relating to PSI's services under the first contract are subject to the $25,000 limitation of liability.

## D. THE SECOND CONTRACT

The second proposal governed PSI's soil boring for the expansion portion of the project.[7]

---

[6]PSI's indemnity clause was limited to negligence claims, while Tippmann's indemnity clause applied to all claims. Regarding the second contract, PSI amended Tippmann's indemnity clause also to limit it to negligence claims.

[7]It appears that Tippmann's claims solely relate to problems related to PSI's work on the renovation portion of the project. (2nd Am. Compl. 4-7.) Because the second contract solely addressed work on the expansion portion of the project, it may be unnecessary to address the second contract. But the Court will address the second contract in case it has misinterpreted Tippmann's allegations against PSI.

Tippmann does not dispute that it accepted the proposal, and PSI amended and returned the subcontract agreement. Thus, both the indemnification clauses regarding negligence claims and the limitation-of-liability clause govern the second contract.

### E. THE THIRD CONTRACT

The third proposal governed PSI's geotechnical-engineering services on the renovation portion of the project. Because no party proffers a purchase order tied to PSI's third proposal, there is no summary-judgment evidence that the third contract was subject to Tippmann's indemnity clause, which routinely was attached to and referenced in Tippmann's purchase orders. Although Tippmann's controller stated in an affidavit that Tippmann's "policy is to issue a Subcontract Agreement to each subcontractor and that the terms of any subcontract agreement issued by Tippmann will govern the parties' relationship," he further averred that "[t]he purchase orders issued to PSI for the Project are attached hereto as Exhibit 5." Exhibit 5 only contained purchase orders tied to the first and second proposals. (Pl. App. 3.) Therefore, there is no genuine dispute regarding the inapplicability of Tippmann's indemnity clause usually referenced in and attached to Tippmann's purchase orders.

Tippmann attempts, however, to raise a genuine dispute regarding whether PSI's limitation-of-liability clause applies to the third contract. (Resp. 10, 19-20; Pl. App. 3.) In an affidavit, the Tippmann employee who signed PSI's third proposal avers that although he "did sign" the signature page of PSI's third proposal, he "d[id] not recall ever receiving, nor reviewing" PSI's third proposal. (Pl. App. 65.) Tippmann's employee additionally states that he "d[id] not recall ever receiving, reviewing, or even being aware of the existence of the general conditions." (Pl. App. 65.) A PSI employee states in an affidavit, however, that the proposal PSI sent to Tippmann for Tippmann's

12

signature and acceptance was, in fact, the proposal letter dated December 23, 2008, and produced as summary-judgment evidence.  (Def. App. 3, 18-25.)

Tippmann does not argue that the third proposal proffered by PSI is not the actual proposal accepted and signed by Tippmann or that the terms Tippmann agreed to were different than those shown in PSI's summary-judgment evidence.  Tippmann's employee merely avers that he does not **recall** seeing the third proposal and general conditions, while admitting he signed the signature page. He does not state that he was unaware of the contents of the third proposal; he only avers that he did not recall receiving or reviewing the third proposal.  Indeed, it would strain credulity to believe Tippmann's employee signed something that he was not aware of.  The third proposal conspiciously alerted Tippmann that PSI's general conditions would apply.  Finally, Tippmann's statements regarding the fax notations on the signature page are unavailing.  Although Tippmann attempts to explain the meaning of two of the notations (Pl. App. 65), it wholly ignores the import of a third fax notation that indicates all pages of the third proposal were faxed to Tippmann.  (Def. App. 24.) Tippmann's summary-judgment evidence fails to raise a genuine dispute as to the material fact of what terms Tippmann agreed to be bound by regarding the third contract, specifically the limitation-of-liability clause.  *See Torjagbo v. United States*, 285 F. App'x 615, 618-19 (11th Cir. 2008) (per curiam); *Receivables Exch., LLC v. Suncoast Tech., Inc.*, No. 10-4152, 2012 WL 1019623, at *6 n.4 (E.D. La. Mar. 26, 2012); *cf. Rankin v. Union Pac. R.R. Co.*, 319 S.W.3d 58, 65 (Tex. App.—San Antonio 2010, no pet.) (holding witness's failure to remember hearing train sound horn or whistle not probative evidence of any failure to sound train's whistle or horn).

## IV.  CONCLUSION

13

The Court concludes that PSI's limitation-of-liability clause, even when read in tandem with Tippmann's and PSI's indemnification clauses, mandates that PSI's indemnification responsibilities under the three contracts are limited to $25,000. The Court OVERRULES Tippmann's objections to PSI's summary-judgment evidence. (Resp. 2-7.) Not only are the objections not clearly identified in the title of Tippmann's response, which could explain PSI's failure to address these arguments, they are without merit. *See* N.D. Tex. Local Civ. R. 5.1(c).

SIGNED January 16, 2013.

Terry R. Means

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE